UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

IN THE MATTER OF VINCENT ANTIGNANO
and DOMENICA ANTIGNANO, Parents on
behalf of the infant disabled child R.A.

                        Plaintiffs,

      -against-

WANTAGH UNION FREE SCHOOL DISTRICT,

                        Defendant.
-------------------------------------------------------------X

**MEMORANDUM & ORDER**

Civil Action No. 07-2540

**APPEARANCES:**

**Law Offices of George Zelma**
Attorneys for Plaintiffs
888 Seventh Avenue, 45th Floor
New York, New York 10106
By:    George Zelma, Esq.

**Ingerman Smith, L.L.P.**
Attorneys for Defendant
150 Motor Parkway, Suite 400
Hauppauge, New York 11788
By:    Christopher Venator, Esq.

**HURLEY, Senior District Judge:**

      Plaintiffs Vincent and Domenica Antignano (the "parents"), parents of behalf of their

minor child R.A.  ("R.A.") (collectively "Plaintiffs") commenced this action against the Wantagh

Union Free School District (the "District") pursuant to the Individuals with Disabilities Act

("IDEA") seeking reversal of the decision of a State Review Office ("SRO") denying Plaintiffs'

request for tuition reimbursement for educational services provided to R.A. during the 2005-2006

school year.  Presently before the Court are Plaintiffs' motion for summary judgment and the

District's cross-motion for summary judgment.  For the reasons set forth below, Plaintiffs'

motion is denied and the District's cross-motion is granted.

### Statutory Background

The IDEA represents Congress's effort "to promote the education of handicapped

children."  *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (internal

quotations omitted).  "The goals of IDEA include "ensur[ing] that all children with disabilities

have available to them a free appropriate public education" and "ensur[ing] that the rights of

children with disabilities and parents of such children are protected." *Winkelman v. Parma City

School Dist.*, 550 U.S. 516, 523 (2007)(quoting 20 U.S.C. §§ 1400(d)(1)(A)-(B) (2000 ed., Supp.

IV)); *accord Forest Grove Sch. Dist v. T.A.*, --U.S. --, 129 S. Ct. 2484, 2491 (2009).  The statute

requires that all states receiving federal funds must provide "all children with disabilities" a "free

appropriate public education."  20 U.S.C. § 1412(a)(1)(A).  "To meet these requirements, a

school district's program must provide special education and related services tailored to meet the

unique needs of a particular child and be reasonably calculated to enable the child to receive

educational benefits."  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007)

(internal quotations omitted).  "Such services must be administered according to an

[Individualized Educational Plan ("] IEP["]), which school districts must implement annually."

*Id.* (citing 20 U.S.C. 1414(d).

Among other things, the IDEA contains provisions governing the development of "a

child's  IEP; criteria governing the sufficiency of an education provided to a child; mechanisms

for review that must be made available when there are objections to the IEP or to other aspects of IDEA proceedings; and the requirement in certain circumstances that States reimburse parents for various expenses." *Winkelman*, 550 U.S. at 523 (citing 20 U.S.C. §§ 1412(a)(10), 1414, 1415).

"To meet [its] obligations [under the IDEA] and to implement its own policies regarding the education of disabled children, New York has assigned responsibility for developing appropriate IEPs to local Committees on Special Education ('CSE'), the members of which are appointed by school boards or the trustees of school districts.  In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Gagliardo*, 489 F.3d at 107-08 (internal citations omitted).  "New York parents who disagree with their child's IEP may challenge it in an 'impartial due process hearing,' 20 U.S.C. § 1415(f), before an [Impartial Hearing Officer ("] IHO["]] appointed by the local board of education, *see* N.Y. Educ. Law § 4404(1).  The resulting decision may be appealed to a [State Review Officer ("] SRO []"], see N.Y. Educ. Law § 4404(2); *see also* 20 U.S.C. 1415(g), and the SRO's decision in turn may be challenged in either state or federal court, *see* 20 U.S.C. § 1415(i)(2)(A)." *Id.* at 108.

## Factual and Procedural Background

The following facts, taken from the administrative record and the parties' 56.1 statements, are undisputed unless otherwise noted.[1]

---

[1] In its counter 56.1 statement, Defendant failed to dispute Plaintiffs' statement that R.A. was denied a free appropriate public education.  However, it is apparent that said failure was an oversight and accordingly, the Court grants Defendant's application to deem that contention disputed.

R.A. was born on May 30, 1992. She was classified and received special education services in preschool.  She was declassified for kindergarten and began attending District schools.  R.A. was diagnosed with attention deficit hyperactivity disorder (ADHD), Pervasive Developmental Disorder (PDD) - not otherwise specified (NOS), Developmental Reading Disorder and Developmental Arithmetic Disorder by Dr. Kent, her treating psychiatrist.  She suffered from frequent ear infections from infancy to age 8 and from benign neutropenia[2] between 9 months and 3 years of age.  Her family history is significant for ADHD and learning problems; she was late in speaking and walking.

R.A.'s CSE History Prior to the Year at Issue

In first grade R.A. was classified as speech and language impaired.  An IEP was developed and she was placed in an inclusion program with half the day spend in a mainstream class and the other half in a self-contained class.  R.A. remained in this program from first through fifth grade. During each of these years, R.A.'s goals were repeated and instructional objectives added; however, no progress reports on the IEP goals were reported to her parents.  In fifth grade (2002-03), her parents noticed a significant decline in R.A.'s abilities; her teachers reported that R.A. was not making progress but rather was increasingly falling behind.  For the 2003-04 school year (sixth grade) R.A. was in a self contained classroom 15:1:1[3].   She had ten goals and one hundred-thirty instructional objectives to meet those goals.  She met only three of her objectives.

---

[2]  "Neutropenia is a condition in which the number of neutrophils in the bloodstream is decreased.   Neutrophils are a type of white blood cell . . . ."  www.medicine.net/neutropenia (Aug. 29, 2009).

[3]  15:1:1 (sometimes written as 15:1+1) refers to a class of no more than 15 students with one teacher and one aide assigned to the class as a whole.

For seventh grade (2004-05), the CSE recommended R.A. be placed in a 15:1:1 self contained special education class and receive counseling services and speech services.  The CSE also recommended that R.A. receive extended school year services and attend Wantagh's summer PARISS program.  The PARISS program is a summer program that provides instruction in reading, math, and writing, and is designed to prevent regression.    In the IEP prepared for her for 2004-05, the CSE wrote:

> The student had multi sensory learning style and demonstrates a severe disability in academic concepts. . . . the student does not demonstrate conceptual knowledge in content areas appropriate to grade level.  The student performs assignments with 1:1 assistance.
>
> There are many days when she shuts down, works at a very slow pace and becomes lethargic with little verbal exchange.  It can be extremely difficult to motivate her on those days and 1:1 assistance is then needed for completion of tasks.
>
> The student needs 1:1 assistance many times throughout the day.  Concepts present difficulty and re-direction and re-teaching is often necessary.  Student needs additional time to complete tasks as well as repeated direction.  The student needs to develop age appropriate social and emotional skills with peers.  The student needs to develop independent problem solving skills.
> The student requires intensive supervision to function in the educational setting . . . with minimal distractions.

Subsequent to the CSE meeting, the parents sent a letter to the CSE, dated May 24, 2004, stating in pertinent part as follows:

> According to [R.A.'s] test scores from 1998 to the present, she has had inconsistent progress and from last year to this year has significantly regresses in some areas. . . . As we discussed with the IEP team . . . we are concerned about [R.A.]'s lack of progress, especially in the area of reading, and how this in turn inhibits her successful involvement and progression in the general curriculum. In January 2003 we raised similar concerns, and as a result, we jointly explored providing [R.A.] a tutor using the Wilson Reading program as a way to help remediate [R.A.]'s reading deficits, and we were advised that this was not possible through the school's

auspices, but that [R.A.] would receive supportive reading in 6th grade to help address her deficits.  Seeing no significant improvements in [R.A.]'s reading, on May 14, 2004, we has R.A. independently evaluated with specific focus on her reading skills. Her recent test scores continue to indicate a lack of progress in closing the gap between her reading level and the reading level of average children her age. . . .  Clearly, as [R.A.] is on the cusp of entering 7th grade time is of the essence if she is to be afforded the opportunity to 'catch up.'  Toward that end we have done some extensive research into these types of programs and have identified the Lindamood-Bell [LmB] Learning Processes.  This research-based program has been in existence since 1975, and is on the New York State Education Department list of approved providers. . . . We would therefore like to explore with you how to incorporate such a program (as previously described) into [R.A.]'s IEP at our [upcoming] meeting.

Thereafter, the parents rejected the CSE's summer recommendation and enrolled R.A. in the LmB summer program.

LmB is an integrated global approach to development of literacy and language that works to develop phonological processing skills in students who exhibit deficits in sensory cognitive functions.  Each student enrolled at LmB goes through an initial evaluation to determine strengths and weaknesses in areas of sensory cognitive processing.  LmB is a scientifically based program that provides focused intensive instruction in the five components required for effective reading instruction. The key to LmB is to provide continuous instruction in all different components so ultimately there is an integrated model where the student can perform independently.

In September 2004, the parents wrote to the District and advised it that they were enrolling R.A. in LmB for 2004-05 school year and that she would be attending there from 8:30 am to 10:30 am Monday through Friday after which she would be attending Wantagh Middle School.   The 2004-2005 school year was settled by the parties.

<u>The CSE Review for the 2005-06 School Year</u>

The CSE held a review to develop R.A.'s IEP for the 2005-06 school year on June 7, 2005 and July 12, 2005.  The parents provided the CSE with a recent independent neuropsychological evaluation of R.A. by Dr. Davidovicz, as well as evaluations and other materials from LmB.

According to Dr. Davidovicz, R.A. had great difficulty formulating and understanding complex language and difficulty with auditory processing, visual spatial skills, fine motor skills, speech articulation, phonetic awareness and attention, and math.  Specifically, as to math, he noted that with the exception of multiplication, her basic computational skills across operations were "markedly problematic."   He opined that the most appropriate classification for R.A. would be learning disabled.  R.A. required intensive, individualized multi-sensory instruction in order to make her " as functional as possible in the time remaining in her educational career.  According to the doctor:

> Academically, she is starting to make some progress with basic reading skills but also demonstrates significant difficulty with reading comprehension secondary to her language comprehension difficulty.  There are also significant problems with basic spelling and writing as well as math. . . . Given the current findings, it is felt that [R.A.] needs to continue the intensive individual, multisensory reading instruction that she is receiving, since it is clearly having a positive impact on her acquisition of skills. She, however, would need a similar approach to her acquisition of other basic skills, including math and writing.  She also should have intensive speech/language remediation for the maximum amount of time allowable to address her difficulties with regard to lexical and structural aspects of language, as well as to teach her strategies to compensate for her language processing difficulty.  It is also felt that intensive, multisensory program should continue during the summer, as should speech/language services.  It is recognized that [R.A.] is in a self-contained class, however, even within such a setting, there need to be major modifications made for her.  The

> special education staff and/or the speech/language pathologist need
> to spend time with her to prepare her for lessons in helping her deal
> with the vocabulary concepts, as well as the language she will
> encounter.  They also need to reinforce and simplify such materials
> after lessons are completed.  Clearly, there also needs to be major
> modifications in the classroom and during testing due to the fact
> that she cannot functionally read, write or do math.  Assistive
> technology can be utilized in the future, but not as a substitute for
> teaching her these basic skills on an intensive basis at this point.
> Should it be too difficult to adapt R.A.'s program in school and
> through Lindamood-Bell, then an alternative placement in the
> private sector will need to be sought.

(Ex. F.)

At the June 7, 2005 annual review, a draft IEP was reviewed. R.A.'s independent reading level was identified as grade two, instructional reading level as grade three and frustration level as grade four.  The proposed program, which included special class counseling one time per six day cycle, and daily speech-language therapy, was reviewed.  The chairperson indicated that the IEP would reflect a recommendation for daily reading instruction.  The parents expressed concern regarding R.A.'s math abilities and requested an individualized math program to address her needs.  The CSE chairperson agreed to investigate whether or not supportive math, in addition to a special education math class would be available to the student.  The parents also expressed concern regarding the proposed goals and the chairperson recommended they meet with R.A.'s service providers to edit the goals, a recommendation the parents later declined.  The CSE recommended that the student attend the District's PARISS summer program, where in addition to the regular program, R.A. would receive daily 1:1 reading instruction for 40 minutes and speech-language therapy three times per week.   The minutes of the meeting indicate that the parents were not ready to commit to the summer program.  The meeting was adjourned with the understanding that it would reconvene to finalize the 2005-06 IEP.  In the meantime, the CSE

members would review the materials that the parents had presented.

As a result of scheduling difficulties, the CSE did not reconvene until July 12, 2005.  The meeting lasted more than five hours.  The draft IEP was reviewed line by line.  The committee determined that R.A.'s classification should be changed to "learning disabled" as a result of Dr. Davidovicz's independent evaluation. The committee recommended that R.A. be placed in a 15:1:1 class for 3 hours and 20 minutes per day and assigned a 1:1 aide[4].  Recommended services included speech-language therapy daily, with alternating group and individual sessions, and counseling one time per six day cycle.  The IEP also recommended daily supportive reading in a 2:1 setting.[5]  The IEP also indicated that supportive math be explored as a possibility, while noting that an appropriate group might not be available on the student's math level.   Numerous supports and accommodations were also included.

The minutes indicate that various revisions were made as a result of requests by the parents, their advocate and other members of the CSE.   During the course of the meeting, the concerns expressed by the parents centered upon two areas: math and reading.

With respect to math, the parents questioned the methodologies to be used and the manner in which the student's math instruction would be delivered.  The special education teacher explained she would use the 1:1 to assist with instruction.  It was further explained to the parents that the aide would have appropriate education/training and would always be under the

---

[4] A 1:1 aide refers to an aide that is assigned to assist a particular student, as opposed to the class as a whole.

[5] Although the testimony at the impartial hearing was that the CSE recommended daily supportive reading in a 2:1 setting, the IEP, in fact, only refers to "daily supportive reading."  *See* Ex. E1.  However, it is clear that all parties understood the recommendation was for a 2:1 setting and therefore the omission was harmless.

supervision of the special education teacher.

With respect to reading, the parents believed that the goals should project multiple year gains, while the school based members of the team indicated that the goals should focus on R.A.'s mastery of specific skills. The parents also requested that R.A. continue to receive reading instruction using the LmB methodology in a 1:1 setting. In response, the chairperson indicated that the District had arranged to have one reading teacher and one special education teacher from each building trained and ready to use the LmB methodology. The parents raised questions about the adequacy of the training. The chairperson suggested the parents meet with a LmB representative and the District teachers would participate in the training so they could come to a decision as to whether the program proposed by the CSE would provide appropriate reading instruction. During the July meeting, the parents declined the summer program offered by the District.

Several days later, the parents sent the chairperson a letter questioning the reasonableness of holding another meeting and requesting a copy of the IEP developed at the last two meeting so they could review it. The chairperson responded, reiterating the offer to schedule a meeting between the parents, LmB representative and District representatives. She further stated that she would interpret a decision by the parents not to attend such as meeting as evidencing that the parents were no longer questioning the District's ability to provide appropriate reading instruction using the LmB program and that she would schedule another CSE meeting so that the fall program could be approved.

By letter dated August 1, 2005, the parents rejected both the summer 2005 and 2005-06 school year programs. In support of their rejection, the parents cited (1) the summer program's

failure to incorporate 1:1 multisensory teaching methods as recommended by Dr. Davidovicz; (2) the proposed math program for the 2005-06 was the same as in past years and not individualized to the student's needs; (3) concern that the proposed reading instruction would successfully address R.A.'s reading deficits; and (4) inappropriateness of academic instruction facilitated by the 1:1 aide.  The parents also indicated that the goals developed at the July 12 meeting had been revised and were now inappropriate.  The parents advised the District they would be enrolling R.A. in LmB for the 2005-06 school year to address her reading and math needs and would be seeking tuition reimbursement for the expenses vis a vis LmB for both the 2005 summer and the 2005-06 school year.

Summer 2005

R.A. attended LmB during the summer for four hours a day, five days per week for ten weeks.  Her instructor's notes indicate that she worked on decoding, multi-syllable processing and reading in context and that R.A. progressed from using fourth grade to using fifth grade material when reading contextually.  The math instruction involved review and practice of basic computational skills across operations and the introduction of decimals and fractions.  R.A. progressed from solving one-step word problems to solving word problems of increasing complexity.

The 2005-06 School Year

R.A. attended the District middle school full-time for the first three days of school.  As of the second week of classes, she was signed out each day at 12:30 to attend LmB.  As a result, R.A. missed out on her daily reading class with a master's level reading teacher who had received training in the use of the LmB process, English, and her daily study skills class.

11

Standardized testing conducted by LmB indicated the between May 2005 and October 2005, R.A. demonstrated progress on specific reading and math skills.  At the same time, the scores on spelling skills and reading comprehension decreased.

The District generated a progress report in November 2005 that indicated R.A. (1) achieved one objective during the first quarter relating to identifying coins and bills and their value and (2) made "some progress" or was "progressing satisfactorily" on the majority of her IEP objectives.

In December 2005, the CSE reconvened and added occupation therapy services of one individual and one group session per six day cycle to R.A.'s IEP and recommended that the 1:1 aide no longer accompany her to non-academic classes.

The instruction R.A. received at LmB focused on reading, math, spelling, and writing. As assessed by LmB, between October 2005 and January 2006, her scores on standardized testing increased with respect to word attack, spelling, sight word recognition, and oral reading. At the same time scores declined on measures of arithmetic and reading comprehension.

<u>The Impartial Hearing</u>

The parents requested an impartial hearing by letter dated February 1, 2006, asserting that the recommended summer program was inappropriate because it was designed to prevent regression not progression and that the recommended program for the academic year did not adequately address R.A.'s needs in math and reading.  They sought both the costs of the program and transportation costs.[6]

---

[6] The parents also sought reimbursement for the independent evaluation by Dr. Davidovicz; the District agreed to this request.

The impartial hearing was held on April 28, May 18 and June 9, 2006. By decision dated November 13, 2006,[7] the IHO denied the parents' request for reimbursement, finding that the program and services recommended by the District's CSE offered R.A. a free appropriate public education.

First, IHO found that there were no procedural violations: the CSE was properly constituted; all of the appropriate reports and evaluations were utilized by the CSE members in fashioning a recommendation; and the parents had a full opportunity to participate in the CSE process. (IHO Decision at 18-19.) The IHO rejected the contention that the CSE's failure to recommend LmB instruction for R.A. rose to the level of a procedural violation. "Parents are equal members of a collaborative CSE team; their opinions and requests and preferences hold no more authority or weight than that of other CSE members. . . .[T]he Parents' preference does not compel the CSE to recommend the Parents' preferred program or level of service. " (IHO Decision at 19.) As to the summer program, the IHO held that while summer/extended programs must be available, the regulations do not address the time frame for such recommendation or availability. In addition, summer services need only be designed to prevent substantial regression; there is no requirement that they be designed to make progress. (IHO Decision at 20-21.)

The IHO then turned to the issue of whether the recommended program and services were reasonably calculated to enable R.A. to receive educational benefits. He began by noting that although the evidence provided "ample support" that R.A. made progress while receiving

---

[7] The Court notes that although dated November 13, 2006, the decision was apparently not sent to counsel until December 14, 2006. The extended date the decision was due in accordance with New York State regulations was September 20, 2006.

instruction at LmB, it was "inconclusive" that LmB was the reason for her progress.  He

characterized the testimony of all the witnesses as consistent with the proposition that "any

multi-sensory intensive reading instruction was valid."  He found that the evidence indicated that

R.A. had significant needs primarily in the areas of reading and math and that based on these

needs, the CSE fashioned an appropriate level of services to address those needs. His analysis

was as follows:

> The July 12, 2005, IEP is comprehensive and focuses on
> R.A.'s deficits.  I find that the goals are appropriate, as are the
> recommended services, and levels of services.  I credit the
> testimony of the District's witnesses - - who are teachers certified
> in the deficit areas to be addressed for R.A. – who made the
> distinction between "individual" instruction and "individualized"
> instruction.  Based on the record evidence, R.A. clearly needs
> intensive individualized instruction --on the other hand, there was
> no testimony or documentary evidence to support the conclusion
> that only 1:1 individual instruction was needed to receive
> educational benefits.  And in fact, the record evidence
> demonstrated that reading instruction in a small group - - 1 teacher
> and 2 students - - was preferable for pedagogical reasons.
>
> The Parents cite Application of Board of Education,
> Massapequa UFSD, Appeal No. 05-009 (2005), as support for their
> position.  This case is distinguishable on its facts. In Massapequa ,
> the student was a very low functioning student with extensive
> special education history.  However, the school district
> recommended an educational program that was clearly lacking in
> sufficiency to addressing the student's needs.  In comparison, the
> recommended program herein offered significantly more service to
> address a student whose deficits were similar to (or less than) the
> student involved in Massapequa.
>
> Accordingly, and based on the record evidence, I must
> conclude that the District recommended an appropriate program,
> placement, and services for R.A. . . .  This conclusion is warranted
> despite the fact that R.A. remained below grade level in reading
> and math abilities, which was a source of frustration for the
> Parents.  But the perceived lack of progress and dissatisfaction
> with R.A.'s educational program and placement (by the Parents)
> does not render that program and placement inappropriate.

(IHO Decision at 22.)

Having determined that the educational services recommended by the District were appropriate, the IHO did not address whether the services selected by the parents were appropriate or whether equitable considerations supported the parents' claim.  *See School Committee of Burlington v. Dept. of Educ.*, 471 U.S. 359 (1985).  The parents appealed the IHO's decision to a SRO, asserting that the IHO was not impartial and he erred in denying their claim for private educational services and related transportation expenses for summer 2005 and the 2005-06 academic year.

The SRO's Decision

The SRO found that the IHO correctly found that the programs recommended by the CSE offered R.A. a free appropriate public education.

The SRO first addressed the parents challenge to the IHO's impartiality, which was grounded on his failure to disclose that he represents school districts in special education matters. The IHO had simply stated that he was not an employee of the Wantagh School District or any other school district in New York and that he had had "other professional dealings with both counsel for both parties in other matters" but did not believe that would prejudice his impartiality in any respect.  The SRO found the IHO's failure to disclose that he represents school districts in special education matters "troubling" as it was a potential conflict of interest that was required to be disclosed.  (SRO Decision at 10-11.)  However, after "carefully reviewing" the transcript and the IHO's decision, the SRO concluded that there was no evidence of actual bias and therefore he was "constrained to find that the [IHO's] failure to disclose . . . does not afford a basis to annul his determination."  (SRO Decision at 11.)

15

Next, the SRO addressed whether the CSE's recommended services for summer 2005 were appropriate.   The SRO noted that the CSE recommended a 12:1+2 special class at the District's six week PARISS program which was designed to prevent regression.  Students in the program are grouped according to age and ability and all students receive reading, writing and math instruction as a 40 minute class, as well as art recreational, computer and physical education components by certified special education teachers.  The SRO further noted that "[i]n addition to the daily reading that was inherent in the PARISS program, for summer 2005 the CSE recommended that the student receive individualized reading instruction five times per week for forty minutes from a reading teacher . . . [and] group speech-language therapy for three 30 minute sessions per week."  (SRO Dec. at 13.)   The SRO rejected the parents' contention that the 2005 summer program was the same program the student had attended in the past, given the increased levels of services from the prior summer, and concluded that the CSE appropriately "considered and recommended a summer program in accordance with the student's need to prevent substantial regression."  (SRO Dec. at 13.)

The SRO then turned to the parents' contentions regarding the recommended placement for the 2005-06 school year.   The SRO began by nothing that the CSE met to develop the IEP, considered the materials provided by the parents and that the parents had the opportunity to participate in the development of the IEP.  He then proceeded to analyze the recommended placement vis a vis the students needs.

> The CSE recommended that for eighth grade the student be placed in a 15:1+1 special education class for core academics and for an additional daily skills period.  In addition, the CSE recommended that the student be assigned a 1:1 aide for academic subjects.  To address the student's reading deficits the CSE recommended that the student be provided reading instruction for

> forty minutes per day in a group of 2:1 from a master's level
> reading teacher who had received training in the Lindamood-Bell
> processes sufficient to allow her to employ program strategies
> during instruction.  To address the student's math deficits, the CSE
> proposed providing math instruction in the 15:1+1 special class,
> with additional assistance provided by the student's 1:1 aide.  In
> addition the CSE recommended that the student receive assistance
> as needed during the study skills component of the special class.
> The CSE also recommended the possibility of participating in a
> supportive math group.  To address the student's expressive and
> receptive language weaknesses the CSE recommended that the
> student receive daily speech-language therapy.  To address the
> student's social/emotional needs the CSE recommended that the
> student receive counseling one time per week.  The IEP developed
> by the CSE contained goals and objectives related to study skills,
> reading, writing, mathematics, speech-language and
> social/emotional/behavioral development.

(SRO Dec. at 14 (transcript references omitted).)

Based on his review of the record, the SRO found that the IEP adequately offered a free

appropriate public education to R.A. for summer 2005 and the 2005-06 school year.  He

reasoned:

> The record shows that [the District's]  recommended
> program for the 2005-06 school year was significantly different
> than the student's prior year IEP in that it included daily reading
> instruction in a 2:1 setting by a teacher trained in the Lindamood-
> Bell processes, a 1:1 aide assigned to the student during academic
> classes and an increase in the frequency of speech-language
> therapy from two sessions per six day cycle to six sessions per six
> day cycle.  The record also shows that respondent's reading teacher
> stated that the student's instruction could be individualized within
> a 2:1 setting.  In addition the student's private tutor, who held
> master's degrees in special education and reading and was certified
> as an Orton-Gillingham practitioner, opined that the student could
> receive an appropriate education in a 2:1 setting.  I concur with the
> impartial hearing officer that the record is insufficient to support
> [the parents'] claim that only one-to-one instruction would confer
> educational benefit. I also agree with the impartial hearing officer's
> conclusion that respondent offered the student a program for
> summer 2005 and the 2005-06 school year that was appropriate to

meet her special education needs.

(SRO Dec. at 14.)    Having concluded that the IEP offered R.A. a free appropriate public

education, the SRO found the parents were not entitled to reimbursement and that it was

unnecessary to address whether the services received by R.A. at LmB were appropriate.

### Discussion

## I.  Standard of Review

The IDEA provides that a reviewing court "(I) shall receive the records of the

administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii)

basing its decision on the preponderance of the evidence, shall grant such relief as the court

determines is appropriate."  20 U.S.C. § 1415(i)(2)(B).  IDEA actions such as this are usually

addressed in a summary judgment context.   However, in this context the inquiry "involves more

than just looking into disputed issues of fact; rather it is a pragmatic procedural mechanism for

reviewing administrative decisions."  *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247,

252 (2d Cir. 2009) (internal quotations omitted).

Under the IDEA, a court's review of educational decisions is "circumscribed."

*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007).  Although such

decisions are subject to independent judicial review, a court "must give 'due weight' to the

[administrative ] proceedings, mindful that the judiciary generally 'lack[s] the specialized

knowledge and experience necessary to resolve persistent and difficult questions of educational

policy.'" *Id.* at 113 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458

U.S. 176, 206 (1982)).  District courts are precluded from "substitut[ing] their own notions of

sound educational policy for those of the school authorities which they review."  *Rowley*, 458

U.S. at 206.  "In order to avoid impermissibly meddling in state educational methodology a

district court must examine the record for any objective evidence indicating whether the child is

likely to make progress or regress under the propose plan." *Cerra v. Pawling Cent. Sch. Dist.*,

427 F.3d 186, 195 (2d Cir. 2005) (internal quotations omitted).  "Judicial deference is

particularly appropriate when . . . the state hearing officers' review has been through and

careful." *M.C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000) (ellipses in original)

(internal quotations omitted).[8]

## II.  Tuition Reimbursement Standards

In *Rowley*, the Supreme Court addressed the issue of what a free appropriate public

education means under the IDEA.  The Court noted that it does not mean "an education that

maximizes a child's potential."  458 U.S. at 189-90. Indeed, the IDEA "does not require a school

district to provide 'everything that might be thought desirable by loving parents.'" *Antonaccio v.*

*Bd of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 726 (S.D.N.Y. 2003) (quoting

*Tucker v. Bay Shore Union Free Sch. Dist.* 873 F.2d 563, 567 (2d Cir. 1989).  Rather the services

provided by a school district must consist of "personalized instruction with sufficient support

services to permit the child to benefit educationally from that instruction." *Rowley,* 458 U.S. at

203.

The Second Circuit has described the tuition reimbursement standard thusly:

> IDEA does not itself articulate any specific level of educational
> benefits that must be provided through an IEP. The Supreme Court,

---

[8] The Court rejects Plaintiffs' contention that it should give the administrative decisions little weight and engage in a de novo review of the record because of the IHO's failure to disclose that he had represented school districts for many years.  The SRO took that failure into account in his review and as set forth herein, the SRO's decision is "reasoned and supported by the record."  *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009).

> however, has specifically rejected the contention that the
> "appropriate education" mandated by IDEA requires states to
> "maximize the potential of handicapped children." [ *Rowley*,] 458
> U.S. at 196 n. 21, 189. The purpose of the Act was "more to open
> the door of public education to handicapped children on
> appropriate terms than to guarantee any particular level of
> education once inside." *Id*. at 192; *accord Lunceford v. District of
> Columbia Bd. of Educ.*, 241 U.S.App. D.C. 1, 745 F.2d 1577, 1583
> (D.C.Cir.1984) (Ruth Bader Ginsburg, J.) (because public
> "resources are not infinite," federal law "does not secure the best
> education money can buy; it calls upon government, more
> modestly, to provide an appropriate education for each [disabled]
> child"). Plainly, however, the door of public education must be
> opened for a disabled child in a "meaningful" way. [ *Rowley* ], 458
> U.S. at 192. This is not done if an IEP affords the opportunity for
> only "trivial advancement." *Mrs. B. v. Milford Bd. of Educ.*, 103
> F.3d at 1121 (quoting Polk v. Central Susquehanna Intermediate
> Unit 16, 853 F.2d 171, 183 (3d Cir.1988)). An appropriate public
> education under IDEA is one that is "likely to produce progress,
> not regression." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*,
> 118 F.3d 245, 248 (3d Cir.1997) (internal citation omitted), *cert.
> denied*, 522 U.S. 1047, 118 S.Ct. 690, 139 L.Ed.2d 636 (1998).

Walczak, 142 F.3d at 130; *accord Cerra*, 427 F.3d at 194-95.

"When a state receiving IDEA funding fails to give a disabled child such an education, the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state. *M.S. v. Bd. of Educ. of City Sch. Dist. of City of Yonkers*, 231 F.3d 96, 102 (2d Cir. 2000).  A three step process is utilized to determine whether parents who challenge an IEP are entitled to private school tuition reimbursement.  "The first two steps focus on whether the 'proposed IEP was inadequate to afford the child an appropriate public education.'" *Cerra*, 427 F.3d at 192 (quoting *Walczak*, 142 F.3d at 129).  First, the court "examine[s] whether the state has complied with the procedures set forth in the IDEA."  *Id.* Next, the court "consider[s] whether the IEP developed through the Act's procedures 'is reasonably calculated to enable the child to receive educational benefits.'" *Id.* (quoting *Walczak*,

20

142 F.3d at 129).  "'If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.' If, however, the IEP is procedurally or substantively deficient, [the court] proceed[s] to the third step and ask whether the private schooling obtained by the parents is appropriate to the child's needs.'" *Id*. (brackets in original omitted) (quoting *Rowley*, 458 U.S. at 207; citing *Walczak*, 142 F.3d at 129).  "In fashioning relief, equitable consideration relating to the reasonableness of the action taken by the parents must be considered." *A.H. v. New York City Dept. of Educ.*, 2009 WL 2602256 (E.D.N.Y. Aug. 21, 2009) (citing *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363-64 (2d Cir. 2006).

As the party initiating the impartial hearing process, Plaintiffs bear the burden of establishing that the services offered by the District were inappropriate. *See Schaffer v. Weast*, 546 U.S. 49 (2005); *M.S.*, 231 F.3d at 102.

It is with these precepts in mind that the Court proceeds to the issues at hand.  As the Plaintiffs do not argue before this Court that the 2005 IEP was procedurally flawed, the Court shall proceed directly to the question of substantive adequacy.

## III.  The CSE's Recommendation for Summer 2005

The IDEA does not automatically require the provision of school services in the summer. Rather, such services must be provided when they "are necessary for the provision of FAPE to the child." 34 C.F.R. § 300.106 (2006).   In determining whether extended school year services are necessary for the provision of FAPE, courts often focus on whether the student is likely to regress during the summer recess. *See, e.g., Mark Di Buo v. Bd. of Educ. of Worcester*, 309 F.3d 184 (4th Cir. 2002) (extended year services "are only necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not

provided with an educational program during the summer months.") (internal quotations

omitted); *Brennan v. Regional Sch. Dist.*, 531 F. Supp. 2d 245, 273-74 (D. Conn. 2008).  New

York State regulations require that "[s]tudents shall be considered for 12-month special services

and/or programs in accordance with their need to prevent substantial regression . . . ."  8 N.Y.

C.R.R. § 200.6(k)(1).   Substantial regression is defined as "a student's inability to maintain

development levels due to a loss of skill or knowledge during the months of July and August of

such severity as to require an inordinate period of review at the beginning of the school year to

reestablish and maintain IEP goals and objectives mastered at the end of the previous school

year."  *Id.* § 2001(aaa).

In support of their contention that the CSE's recommendation for Summer 2005 was not

appropriate for R.A., the parent argue that (1) R.A. had attended the PARISS program since the

summer 2001 and had regressed; (2) during the summer of 2004 when the parents choose LmB

over PARISS, R.A. made progress; (3) the independent neuropsychological evaluation

recommended R.A. continue with LmB for the summer of 2005;  and (4) there is testimony to

support their position that R.A. would have regressed had she not continued at LmB during the

summer of 2005.

Have carefully reviewed the record the Court finds that there is adequate support for the

SRO's determination that the CSE's recommendation for summer 2005 was appropriate.

Certainly, the parents' frustration in being offered a program that they perceived as having

previously failed their child is understandable.  However, the record is clear that in fact

modifications to the program were incorporated into the CSE's recommendation, including daily

individual reading.  While there is some opinion evidence to the effect that the forty minutes of

recommended individual instruction was insufficient to prevent regression, there is also evidence to support the conclusion of both the IHO and the SRO that the forty minutes of 1:1 instruction was reasonably designed to prevent regression.  Those finding warrant deference; it is not this Court's role to substitute its own judgment for that of the SRO.

As the recommended placement for Summer 2005 was appropriate, plaintiffs are not entitled to reimbursement for tuition and cost for their unilateral decision to place R.A. in LmB for the summer of 2005.

## IV.  The Recommendation for the 2005-06 School Year

The parents maintain that the recommended program for the 2005-06 school year was insufficient as it failed to address R.A.'s needs in reading and in math.  The Court shall consider each area of need separately.

### A.  Reading

Plaintiffs' challenge to the sufficiency of the CSE's recommendation to address R.A.'s reading needs may fairly be summarized as follows: (1) the amount of supportive reading was insufficient as it consisted of only 200 minutes per week as contrasted with 1200 minutes at LmB; (2) supportive reading was not provided 1:1 but rather 2:1 despite overwhelming evidence that R.A. had difficulty functioning in a group of 2:1 and consistently needed 1:1 assistance; and (3) the supportive reading services were to be provided by a reading teacher who is not certified in LmB, Orton-Gillingham, Wilson or any other similar multi-sensory reading program.

Proceeding in reverse order, the Court rejects that Plaintiffs' contention that a teacher "certified" in LmB or another multi-sensory approach was required.  The District proposed to provide daily supportive reading by a certified reading teacher who received training in both Lmb

23

and the "Wilson methodology," another multisensory approach. (TR. at 584-585). The record evidence submitted by Plaintiffs supports the conclusion R.A. would benefit from "a" multi-sensory approach and not necessarily only the multi-sensory approach employed in LmB. (*See* Ex. F (Davidovicz Rpt).; Tr. at 187-90; 321-22.) *Cf. E.S. v. Indep. Sch. Dist No. 196*, 135 F.3d 566, 569 (8th Cir. 1998) (rejecting claim that IDEA required school district to provide one-to one tutoring under the Orton-Gillingham method based on parental preference as it is up to educators to determine the appropriate methodology).

Turning next to this issue of supportive reading in a 2:1 versus a 1:1 setting, there is sufficient evidence in the record to support the District's position that a 2:1 setting was appropriate. For example, Ryan testified that 2:1 is often more productive because the students can play off of one another. (Tr. at 487.) In addition, R.A. has socialization issues that the 2:1 reading setting would also address. Finally, 1:1 support is in fact supplied to R.A. throughout the day in the form of an aide. Even if placement in a 1:1 supportive reading program would be best for R.A., "the IDEA does not require school districts to provide 'the best' possible placement that can be imagined . . . so long as the district offers to provide an appropriate education, defined as one which allows the child to receive meaningful educational benefit." *E.H. v. Bd of Educ. of the Shenendehowa Cent. Sch. Dist.*, 2009 WL 3326627, at *3 (2d Cir. Oct. 16, 2009) (Summary Order).

Nor is the District's decision to provide R.A. with 200 minutes per week of supportive reading a basis for finding the IEP deficient. The testimony before the IHO was that most students who have significant reading deficits receive additional reading support one or two times per week whereas R.A. was to receive such services 5 times per week and in a 2:1 setting.

(Tr. at 480-87.)  Given that this was both an increase in the services previously provided to R.A. and in the services usually provided to student with significant reading deficits, this Court cannot conclude that the IEP was not likely to produce progress or provide a meaningful benefit vis a vis reading to R.A.

**B.  Math**

Plaintiffs maintain that R.A.'s math placement is deficient as she was "placed in a special education Algebra with no modification for [R.A.]'s needs in math**."**  (Pl.'s Mem at 17.)  The record demonstrates, however, that in fact R.A.'s special education teacher modifies the curriculum to meet R.A.'s need.  (Tr. at 567-71.)  Nor is the Court persuaded by the 2005-06 placement was just a "repeat" of what proved unsuccessful in the past.  Such an argument fails to recognize that for the 2005-06 school year, R.A. was provided an individual aide for the first time.   Again, the Court cannot conclude that the program components in the IEP were not reasonably calculated to benefit R.A. educationally.

Finally, the Court notes that the placement recommended by the CSE was less restrictive than the program chosen by the parents.  *Cf.* 20 U.S.C. § 1412(a)(5)(A) (children should be educated in the least restrictive environment that they can make meaningful progress in).

In sum, the IEP for the 2005-06 school year offered R.A. a free appropriate public education and the parents were not entitled to reimbursement for education services provided to R.A. during the 2005-06 school year.

**Conclusion**

For the reasons set forth here, Plaintiffs' motion for summary judgment is denied  and Defendant's cross-motion is granted.  The Clerk of Court is directed to enter judgment in favor of

Defendant and upon entry of judgment to close this case.

**SO ORDERED.**

Dated: Central Islip
        January 4, 2010

/s/_____
Denis R. Hurley
Senior District Judge